[No. 10194. Department One. August 16, 1912.]

HOLT MANUFACTURING COMPANY, *Appellant*, v. L. O.
THOMAS *et al.*, *Respondents*.[1]

ATTACHMENT — GROUNDS — DISPOSING OF PROPERTY TO HINDER
CREDITORS—EVIDENCE—SUFFICIENCY. There is sufficient evidence to
support an attachment on the ground that the debtors had disposed
of their property with intent to defraud their creditors, where it
appears that the debtors were insolvent, and owed four principal
creditors $34,000, that they had property of the value of $24,000 to
$30,000, all of which they transferred by absolute conveyances to a
creditor whose claim was $5,000, who made inconsistent statements
and claimed at first, according to several witnesses, that he took the
property as security for his claim and a surety claim of $6,000, and
afterwards offered to pay off other creditors who were not consulted;
and there was evidence that the debtors' purpose was to prevent the
attaching creditor from carrying out threats to enforce its claim by
suit; the fact that they intended to prefer a creditor, as claimed by
them, not being sufficient to warrant a dissolution of the attachment,
where it appears that they also intended to hinder and delay other
creditors and that the preferred creditor aided therein.

APPEAL—REVIEW—HEARING ON AFFIDAVITS. Upon reviewing an
order dissolving an attachment, the supreme court is not called upon
to follow the findings of the lower court upon disputed questions of
fact, where the hearing was entirely upon affidavits.

FULLERTON, J., dissents.

Appeal from an order of the superior court for Adams
county, Pendergast, J., entered November 28, 1911, dis-
solving an attachment, after a hearing before the court upon
affidavits. Reversed.

*W. W. Zent*, for appellant.

*Lovell & Davis*, for respondents.

PARKER, J.—The plaintiff commenced this action in the
superior court seeking recovery from the defendants upon
two promissory notes and an open account aggregating ap-
proximately $5,000. At the same time, the plaintiff sued

[1]Reported in 125 Pac. 772.

out a writ of attachment against the property of defendants upon the ground that they had assigned, secreted, and disposed of their property with the intention to delay or defraud their creditors. The defendant moved the court to dissolve the attachment, alleging that it was wrongfully issued. The motion came on for hearing before the court upon evidence produced in the form of affidavits only, in behalf of the respective parties; the only issue involved being as to whether or not the defendants had made disposition of their property with intention to delay or defraud their creditors. This issue being submitted on these affidavits, the court entered its order dissolving the attachment. From this order, the plaintiff has appealed.

On the 2d day of October, 1911, and for some time prior thereto, respondents were engaged in farming on an extensive scale, in Adams county. On that date they were insolvent, and owed their principal creditors approximately as follows:

W. J. Bennington .......................... $5,000
Pioneer National Bank of Ritzville........... $12,000
Bank of Lind ............................. $12,000
Holt Manufacturing Co. (Appellant) ....... $5,000

The total value of their property at that time, which consisted of land, stock, farm implements, and wheat on hand, was between $24,000 and $30,000. A few days prior to October 2d, the vice president of appellant had a conversation with both of respondents in which payment of the amount due upon the indebtedness here sued upon was demanded of them, and in which conversation they were given to understand that legal proceedings would be promptly taken looking to the securing and collection of their indebtedness to appellant unless it was immediately paid. They then pleaded for an extension of time, promising to pay at least $2,400 upon the indebtedness in a few days when they would sell some of their wheat, and promising to meet a representative of appellant at Lind and make the $2,400 payment on

October 4th. On that day or possibly the day previous, in a telephone conversation with the vice president of appellant, one of respondents informed him that they would not meet the representative of appellant at the time stated and would do nothing more for appellant, as other arrangements had been made. On October 2d and 3d, which was after the understanding had as to the payment of the $2,400 and before the agreed time for such payment had arrived, respondents executed two bills of sale and a quitclaim deed conveying substantially all of their personal property and land, which was of the value of $24,000 or more, to W. J. Bennington. These facts we think may be considered as established beyond dispute.

These conveyances to Bennington were absolute in form, contained no provisions indicating that they were given as security, nor that Bennington was taking the title to the property in trust for any other creditor than himself. It is now claimed, however, by respondents and Bennington that these conveyances were made to him in trust for the payment of the claims of himself, the Pioneer National Bank of Ritzville, and the Bank of Lind, in this order. These claims, as we have already noticed, would aggregate approximately $30,000. We will now notice the principal statements made in the several affidavits of witnesses relating to facts which are more or less in dispute.

One witness states in his affidavit, in substance, that on October 6th Bennington said he was not acting in the interest of any one else in taking the property by these conveyances, and that they were taken to secure him in the sum of $5,000 owing to him by respondents, and also to secure him to the extent of $6,000 for which sum he was surety for respondents. This $6,000 was evidently a part of the indebtedness owing by the respondents to one of the banks. This witness also states that Bennington stated to him at that time that the conveyances were taken as security only and intended as mortgages.

Another witness stated in his affidavit, in substance, that on October 6th he heard a conversation between Bennington and the witness above mentioned, which conversation was evidently the same one above mentioned, wherein Bennington stated that the conveyances were made only as security to him and that he had not purchased the property.

Two other witnesses stated in their affidavits, in substance, that on about October 20th they had a conversation with both of respondents, wherein they stated, in substance, that appellant as one of their creditors had made unreasonable demands on them and was crowding them for the payment of the indebtedness due it, and had threatened defendants with suit and attachment unless the same was settled; that they had gone to their friend Bennington and advised him of the acts and threats of appellant, and at the suggestion of Bennington they then transferred to him all of their real and personal property, and that the transfer had been made for the purpose of preventing appellant from getting any undue advantage; that Bennington being then present, claimed that he was going to use the property for the purpose of realizing on his own claim first, and thereafter he would turn the balance over to the Pioneer National Bank of Ritzville and the Bank of Lind. These witnesses also state that respondents said that Bennington advised them to transfer their property to him for the purpose of preventing appellant from carrying out its threat to enforce its claim.

Another witness, who is interested in the Bank of Lind and represented it, states in his affidavit, in substance, that he had a conversation with Bennington about the 6th or 7th of October relating to the conveyance of the property to him by respondents, wherein Bennington stated that the conveyances had been made to him as security only to secure what respondents were then owing him and to secure him on certain notes that he was surety on for them payable to the Pioneer National Bank of Ritzville; Bennington further stating to the witness at that time that, if the defendants could be

reinstated upon the ranch in Adams county, that he would agree with the witness for the Bank of Lind that the property should be treated as security for the amount owing the Bank of Lind by respondents as well as for the amount owing him, and that the proceeds of the property would be by him distributed *pro rata* to the Bank of Lind, to Bennington, and to the Pioneer National Bank of Ritzville, provided, however, that the witness would comply with certain conditions named in aiding and assisting Bennington to reinstate the defendants upon the ranch. The witness further states that at no time did the Bank of Lind, nor any one acting for it authoritatively, take or receive from defendants any property in settlement of their indebtedness to it, and that it has since brought suit to recover such indebtedness.

Another witness, the president of the Pioneer National Bank of Ritzville, states in his affidavit that he agreed with respondents and Bennington that the conveyances should be made to Bennington in trust for the payment of the claims of Bennington, the Pioneer National Bank of Ritzville, and the Bank of Lind, in this order. It is not claimed by him that such agreement or understanding was evidenced in writing.

The substance of the affidavits of the respondents is that they did not make the conveyances with intent to defraud their creditors, but that such conveyances were made to Bennington for the purpose of paying the indebtedness due him, the Pioneer National Bank of Ritzville, and the Bank of Lind. Whether or not respondents understood that those claims were to be paid in this order does not appear from anything they have stated in their affidavits. They claim, however, that the conveyances were absolute, and were not made with intent to delay or defraud their creditors.

Another witness, one of the attorneys for respondents, states that he was present at the making of the conveyances, was in consultation with respondents, that he heard all the conversation leading up to the making of the conveyances, and that they were not made as security but as an absolute

transfer to Bennington; and that Bennington then delivered to respondents all of the evidence of indebtedness he had against them. The affidavit of this witness is silent upon the question of how the surplus was to be applied by Bennington after the satisfaction of his own claim. We think the foregoing is a fair summary of all of the principal facts disclosed by the affidavits.

Whether or not these facts show an intent on the part of respondents to delay or defraud their creditors, and especially appellant, within the meaning of the attachment law, is the problem for our solution. What the intention of respondents and Bennington was in that respect is to be determined by their acts and words which were seen and heard by others, much more than by what they may now say that their intentions were at the time. It may be conceded that they intended to prefer Bennington as a creditor and still not be subject to the charge of intending to delay and defraud appellant or other creditors; but if the circumstances proven show that they intended the latter as well as the former, the conveyances made with such intention would support attachment proceedings at the instance of this appellant. In Bump on Fraudulent Conveyances (4th ed.), §§ 172, 173, following a statement of the general rule of law allowing honest preference to creditors, the author says:

"A transfer, however, may be fraudulent, although it is made in consideration of an honest debt, for an honest claim may be used as a cover to a covinous transaction. The distinction is between a transfer made solely by way of preference of one creditor over others, and a similar transfer made with a design to secure some benefit or advantage therefrom to the debtor, or to delay creditors in the collection of their debts. While the law permits an insolvent debtor to make choice of the persons he will pay, it denies him the right in doing it to contrive that other creditors shall never be paid, or to use the debt of the preferred creditor as a colorable consideration to screen and protect his property from their claims or to delay, hinder, and embarrass them in the enforcement of their demands. . . .

"The amount of the property transferred compared with the debt intended to be secured or paid, and the number, amount, and character of the other debts, are proper subjects for consideration in determining the good faith of the transaction towards other creditors. The property must bear a reasonable proportion to the preferred debt."

And at § 174 the author further observes:

"Creditors also are not allowed to gain a preference by means of a secret undertaking to hold a part of the property for the benefit of the debtor. The law looks with great jealousy upon the manner of giving preferences, and denounces all departures from good faith, and requires that the parties shall not secure any covert advantage to the debtor in prejudice of his creditors."

In *Ellis v. Musselman*, 61 Neb. 262, 85 N. W. 75, in considering the effect of an intent to prefer a creditor with an intention to defraud other creditors, the court observed:

"It is true that Joseph Ellis was indebted to his sons at the time he conveyed to them the land in question, but that fact did not necessarily make the conveyances valid, nor shield them from the assaults of creditors. The plaintiffs in error might lawfully accept security from their father, but it was not permissible for them to do so with the intention of defrauding other creditors. If a conveyance is the product of two motives, one innocent and the other corrupt, it is, according to all the authorities, within the proscription of the statute of frauds."

In the same decision the court quotes with approval the text in 14 Am. & Eng. Ency. Law (2d ed.), pp. 295, 296, as follows:

" 'Although a creditor who obtains from an insolvent debtor an assignment of property in payment of, or as security for, his debt, may know that his debtor is acting with the design of delaying and defrauding other creditors, he will not lose his preference, by reason of such knowledge, if he takes the assignment in good faith, and without any view of aiding in the consummation of the purpose, further than necessarily results from securing a preference to himself. If, however, it appears from the circumstances attending the

transaction that the preferred creditor was not acting with the sole purpose of securing the payment of his own debt, but also from a desire to aid the debtor in defeating other creditors, or in covering up his property, or in giving him a secret interest therein, or in locking it up in any way for the debtor's own use and benefit the creditor will not be protected, but the transaction will be declared fraudulent.' "

The following decisions of this court are in harmony with these views: *O'Leary v. Duvall*, 10 Wash. 666, 39 Pac. 163; *Hotaling Co. v. Clancy*, 21 Wash. 1, 56 Pac. 929; *National Surety Co. v. Udd*, 65 Wash. 471, 118 Pac. 347. In the last cited case, it is true, the court declined to set aside the conveyances as a fraudulent preference, but nevertheless the principles recognized in that decision are in harmony with the views indicated by the above quotations.

Now the main facts disclosed by these affidavits pointing to an intent on the part of respondents to delay and defraud this appellant as one of its creditors we think may be fairly summarized as follows: First, insolvency of respondents at the time of the conveyances with full knowledge thereof and full knowledge of the affairs of respondents and of the indebtedness due from them to appellant and of appellant's purpose to enforce the same, on the part of Bennington who accepted the conveyances; second, the conveyances made to Bennington absolute in form, without any language therein or in any other instrument of writing expressing any such trust for the benefit of the banks in addition to himself as is now claimed by him and respondents; third, conveyance of the property to Bennington having a value of at least twice the amount of the indebtedness due from respondents to him including the amount of his surety obligation incurred in their behalf; fourth, friendly concern on the part of Bennington for respondents, evidenced by his advice to them to make conveyance to him of all their property beyond that which would be reasonably sufficient to satisfy his own claim, and also evidenced by his offer to the president of the Bank of Lind to share *pro rata* with it in the payment of its claim

against respondents upon condition that its president would aid in reinstating respondents upon the farm; also evidenced by his concern in the efforts of respondents to thwart any legal proceedings which might be instituted by appellant looking to the collection of its claim, his efforts in this regard going far beyond what was necessary to secure a fair preference to himself as a creditor; fifth, inconsistent statements made by Bennington as to the purpose of the conveyances; sixth, concern of respondents indicating their desire to hinder and delay appellant in the collection of its claim as well as a desire to merely prefer other creditors; seventh, the statement of the attorney for respondents to the effect that the sale was absolute and intended so to be by respondents and Bennington, yet failing to state any facts indicating the nature of the claimed trust in favor of the banks.

It may not be easy to point out among these facts any particular one which of itself shows an intent on the part of respondents to delay and defraud appellant by these conveyances; but it is probably seldom that such an intent can be shown by other than a series of acts. We think that, taking all of the facts shown by these affidavits, making due allowance for the conflicting statements therein, there is sufficient here shown to require our holding that respondents in making these conveyances did so not for the sole purpose of preferring *bona fide* creditors, but also with the specific intent to hinder, delay and defraud this appellant as a creditor. We think that both they and Bennington, in the making of these conveyances, did not manifest that degree of good faith and fairness which the law demands in the conveyance of property by an insolvent debtor to one of his creditors for the purpose of discharging the debt owing such creditor. Clearly, if these conveyances were made to Bennington for the purpose of discharging his debt alone, they were fraudulent and void as to other creditors because of the manifest excessive value of the property conveyed over and above the amount of the obligation sought to be satisfied; and we are not at all im-

pressed with the claim that the surplus value was to be in trust for the banks. Even if such were the original intention of respondents and Bennington, the facts point to the intent of both respondents and Bennington to delay and defraud appellant. We think such intent is sufficiently shown to render the conveyances void as to appellant.

Some effort is made to invoke the general rule that this court should not arrive at a different decision than that of the trial court upon a disputed question of fact. That rule has but little application here, because no oral evidence was submitted to the trial court and it had no better opportunity to see or hear the witnesses than we have. Indeed, the question was not even determined by a resident judge, but was submitted to a visiting judge from another district. The reason for the rule invoked is therefore not present in this case.

We are of the opinion that the trial court erroneously dissolved the attachment. It follows that the order to that effect must be reversed. It is so ordered.

GOSE, CROW, and CHADWICK, JJ., concur.

FULLERTON, J., dissents.